IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DENISE A. WAGNER, | ) | CASE NO. 5:19CV2631 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Denise Wagner ("Wagner") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).

As set forth more fully below, the ALJ failed to explain how his RFC determination took

into account the marked limitations assessed in the opinion of Wagner's therapist, licensed social

worker Ms. Janis, and the RFC is inconsistent with at least one of those limitations, despite the

ALJ's assertion that he had taken those limitations into account.  As a result, the undersigned

recommends that the Commissioner's decision be **REVERSED and REMANDED** for further

proceedings consistent with this opinion.  On remand, the ALJ will also have an opportunity to

reassess the opinion of Ms. Kleppel, an evaluating physical therapist.

### I. Procedural History

In October 2015, Wagner filed applications for DIB and SSI alleging a disability onset

date of June 2, 2009.  Tr. 15, 200.  She alleged disability based on "mental/depression" and "low vision left eye."  Tr. 235.  After denials by the state agency initially (Tr. 105, 106) and on reconsideration (Tr. 141, 142), Wagner requested an administrative hearing.  Tr. 161.  A hearing was held before an Administrative Law Judge ("ALJ") on Augusts 15, 2017, in which Wagner amended her alleged onset date to April 10, 2013.  Tr. 35-90.  In his October 10, 2018, decision (Tr. 15-26), the ALJ determined that there were jobs in significant numbers in the national economy that Wagner could perform, *i.e.*, she was not disabled.  Tr. 25-26.  On September 10, 2019, the Appeals Council denied Wagner's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Wagner was born in 1968 and was 40 years old on her alleged onset date.  Tr. 25.  She worked as a manager at a service station for 25 years and last worked in 2008.  Tr. 42, 236.  She graduated from high school and has two years of college.  Tr. 48, 49, 236.

### B. Relevant Medical Evidence[1]

On April 10, 2013, Wagner saw her general practitioner, Dr. Clayton, M.D.  Tr. 910.  She was fatigued, very anxious and depressed, and sleeping all the time.  Tr. 910.  Her Zoloft was no longer helping and her hands and feet felt like they were on fire for the past two months.  Tr. 910.  She felt sore all over and complained of muscle and joint aches.  Tr. 910.  Her migraines were getting more frequent, occurring, at worst, 4-5 times a week.  Tr. 910.  She was taking Maxalt "only once a week and trying to avoid using too many OTCs."  Tr. 910.  Dr. Clayton

---

[1] Wagner challenges the ALJ's treatment of the opinion of her therapist, Ms. Janis, and the opinion of the physical therapist who evaluated her, Ms. Kleppel.  However, the bulk of the evidence discussed by the parties in their briefs is Wagner's mental health records.  Accordingly, the undersigned primarily discusses Wagner's mental health evidence in the balance of this opinion.

diagnosed migraine headache, myalgia, and insomnia, recommended a consultation to a headache clinic, and started Wagner on Cymbalta to address her depression and anxiety.  Tr. 910.

On August 2, 2013, Wagner returned to Dr. Clayton for breast cancer screening.  Tr. 905. She reported that the Cymbalta was working well for her depression and had helped her diffuse joint/muscle aches, although she still felt achy and she had mild stiffness.  Tr. 905.  She was taking Depakote daily and her headaches were under excellent control.  Tr. 906.

On March 16, 2014, Wagner had an Intake Mental Health Assessment at Ohio Guidestone upon referral from her migraine specialist.  Tr. 296.  She reported that she often felt sad, did not like to interact or be around others, felt unloved, and had suicidal thoughts.  Tr. 296. She stated that she had unresolved issues from the past regarding domestic violence and childhood trauma.  Tr. 296.  Upon exam, she was well groomed, had a depressed mood and flat affect, and she admitted to suicidal thoughts and a plan, but no intention to carry out the plan. Tr. 299.  She was diagnosed with recurrent depressive psychosis–unspecified.  Tr. 301.

On June 24, 2014, Wagner saw licensed therapist Ms. Acuna at Behavioral Health Counseling.  Tr. 279-280.  They explored Wagner's "thoughts and feelings reportedly associating to past trauma [history] in lieu of present events contributing to her [symptoms]."  Tr. 279.  Wagner reported that she had used coping skills she had learned and that they were effective.  Tr. 279-280.

On July 8, 2014, Wagner presented at Marymount Hospital's emergency room upon the advice of her therapist due to increased depression and suicidal ideation with a plan to use a gun. Tr. 313, 508.  She stated that she had been under a lot of stress lately due to taking care of her fiancé's mother, who had dementia.  Tr. 508.  She reported a history of prior suicide attempts by

overdose.  Tr. 508.  She was currently not taking any psychotropic medication and had been unable to see a psychiatrist.  Tr. 313.  Upon exam, she was calm and cooperative, her thought process was intact and linear, her speech was soft and slowed, her mood was depressed, and her affect was flat.  Tr. 313.  She was assessed as a low suicide risk and admitted.  Tr. 314.  She was started on Cymbalta, Depakote and Wellbutrin.  Tr. 314, 521.  She was assessed with major depressive disorder, recurrent, severe, without psychotic symptoms, and discharged on July 11.  Tr. 520.

On July 23, 2014, Wagner saw licensed social worker Ms. Janis at Signature Health for a Diagnostic Assessment.  Tr. 1597.  She presented with guarded affect, good eye contact, fair grooming, and "improved friendly in duration."  Tr. 1606.  She reported a lack of trust of others and low self-esteem.  Tr. 1606.  She agreed to follow up with therapy and thereafter saw Janis regularly.  Tr. 1607.

On July 31, 2014, Wagner saw psychiatrist Dr. Gross, Psy.D., at Signature Health.  Tr. 1491.  She described her mood as up and down, irritable, and sad, although Dr. Gross commented that she did brighten nicely.  Tr. 1493.  Her judgment was affected by having been the victim of fairly extensive abuse, and her insight was "partial."  Tr. 1493.  Wagner described her history of depression and treatment with medication for many years, starting at age 18.  Tr. 1495.  Dr. Gross's impression was that Wagner seemed to have post-traumatic stress disorder and seemed to have a number of strengths, including having worked at a gas station for 25 years despite her troubles and having loved working there.  Tr. 1496.  She presented with symptoms of recurrent major depression and a history of 2-3-day long periods "when it sounds like she may be at least hypomanic if not manic."  Tr. 1496.  Dr. Gross increased her Valproic acid.  Tr. 1496.

On September 8, 2014, Wagner returned to Dr. Gross.  Tr. 1501.  She was feeling a little

better, but was experiencing nystagmus,[2] which, Dr. Gross observed, is a side effect of Valproic acid.  Tr. 1501.  She reported feeling excessively guilty most of the time and thinking about hurting herself when she gets angry.  Tr. 1501.  She had pulled some individual hairs out and dug her fingernails into her palms when angry.  Tr. 1501.  Dr. Gross adjusted her medication.  Tr. 1501.

On September 6, 2014, Wagner saw a certified physician's assistant, Mr. Fox, in the neurology department for her headaches.  Tr. 410.  She reported improvement in her headaches since she had had a nerve block at her last appointment three months prior, not having any headaches until three days before her current appointment.  Tr. 410-411, 414.  She received another greater occipital nerve block.  Tr. 414.

On October 30, 2014, Wagner saw Dr. Gross.  Tr. 1502.  She was feeling better and credited the adjusted dose of Valproic acid.  Tr. 1502.  Upon exam, she was appropriately dressed, had good eye contact, euthymic mood, and normal speech and thought process.  Tr. 1504.  Dr. Gross adjusted her medications, including increasing her Depakote.  Tr. 1506.

On December 11, 2014, Wagner saw Dr. Gross.  Tr. 1507.  Upon exam, she was sad and mildly irritated.  Tr. 1509.  She was experiencing PTSD and depressive symptoms (nightmares, crying, feeling alone) after contact from her ex regarding child support.  Tr. 1511.  Dr. Gross adjusted her medications.  Tr. 1511.

On January 6, 2015, Wagner saw Dr. Gross, reporting feeling a little bit better since her last visit.  Tr. 466.  She was still having nightmares and had had migraines, which she believed had been caused by one of her medications, prazosin.  Tr. 466.  As a result, Dr. Gross substituted clonidine for prazosin.  Tr. 466.  Her interest was good, she was not feeling excessively guilty,

---

[2] Nystagmus is an involuntary, rhythmic motion of the eyes.  See https://www.hopkinsmedicine.org/health/conditions-and-diseases/nystagmus (last visited 9/21/2020).

her energy was "on the low side," and her concentration was "variable." Tr. 466.

On January 22, 2015, Wagner saw Dr. Gross. Tr. 467. She was doing "ok" but reported an internal tremor when stressed. Tr. 467. Her nightmares had improved and her migraines were better on clonidine. Tr. 467. She was able to sleep when not being kept awake by her mother-in-law, who suffered from dementia. Tr. 467. Dr. Gross adjusted her medications with an aim towards helping the tremors and intrusive thoughts. Tr. 467.

On February 19, 2015, Wagner saw Dr. Gross. Tr. 1522. Upon exam, she was well groomed, had good eye contact, "ok" attention and concentration, a sad mood and constricted affect, intact recent and remote memory, and normal thought process and content. Tr. 1524. She reported being "quite stressed" due to taking care of "everybody" and that family members were ill and fighting. Tr. 1526. She was unable to get away from the stress. Tr. 1526. Her concentration was a problem and she was still having intrusive memories during the day, although they were a little better on clonidine, and she had been anxious and hypervigilant. Tr. 1526. Dr. Gross remarked that Wagner's mood was significantly more stable than it had been, despite continuing to have symptoms. Tr. 1526. She adjusted her medications and encouraged Wagner to inquire about getting a home health aide for her in-laws. Tr. 1526.

On March 23, 2015, Wagner saw Dr. Gross and was upset about a new diagnosis of diabetes mellitus and having to pay attention to what she ate. Tr. 470. Otherwise, she was doing ok: she had an irritable mood and was hypervigilant. Tr. 470. She was sometimes sleeping too much, disinterested in doing things, and had fine concentration. Tr. 470.

On May 11, 2015, Wagner saw Dr. Gross, advising that Dr. Clayton had put her on Effexor, which was for her migraines, and which was helping. Tr. 471. She reported being irritable, sleeping too much, feeling guilty, and that her concentration was mostly pretty good,

except for when she felt down.  Tr. 471.  Her nightmares and intrusive memories were decreasing in frequency.  Tr. 471.  Anger continued to be a problem.  Tr. 471.

On June 15, 2015, Wagner saw Dr. Gross, stating that she had been crying for the past couple of days for unclear reasons.  Tr. 472.  Her mood had been generally down, her energy was low, her concentration was normal, and her nightmares had increased.  Tr. 472.  Dr. Gross started her on Lexapro.  Tr. 472.

On August 26, 2015, Wagner saw Dr. Gross, reporting that she was still under a great deal of stress, including caring for her daughter and trying to get her mother-in-law into a long-term care facility, while continuing to care for her, including bathing her regularly.  Tr. 564.  She had not had nightmares or flashbacks lately.  Tr. 564.  She felt irritable and had poor sleep and poor sleep hygiene.  Tr. 564.  Upon exam, she had good eye contact, ok concentration, her mood was "like, whatever"/mildly sad, but she was able to smile and even laugh.  Tr. 561.  Dr. Gross stated that her medications seemed to be helping and that Wagner seemed to be doing well.  Tr. 564.

On October 12, 2015, Wagner saw Dr. Gross and reported that she was not as good as she had been.  Tr. 570.  She felt guilty for no longer carrying for her mother-in-law, who had been admitted to a long-term care facility.  Tr. 570.  She was irritable and weepy, sleeping and eating too much, not interested in doing fun things, and her energy and concentration were down.  Tr. 570.  Dr. Gross increased her Lexapro.  Tr. 570.

On November 11, 2015, Wagner told Dr. Gross that she felt exposed and uncomfortable with her back to the window and she moved to the other chair in Dr. Gross's office.  Tr. 570, 573.  Her sleep was poor, her mood had been grumpy and sad, and she had been crying a lot over "silly things" and stories on the news.  Tr. 576.  Upon exam, her mood was sad and constricted.

Tr. 573.  Dr. Gross adjusted her medication.  Tr. 576.

On November 25, 2015, Wagner saw Dr. Gross and had a sad mood and constricted affect.  Tr. 577, 579.  Her anxiety had improved but her depression remained.  Tr. 582.  Dr. Gross increased her Lexapro.  Tr. 582.

On January 26, 2016, Wagner told Dr. Gross that her mood had been stable, but that she got tired a lot.  Tr. 1381.  She had been spending a lot of time at the hospital due to her father-in-law being very ill.  Tr. 1381.  Her interest was good and her energy was "not bad."  Tr. 1381.  Dr. Gross increased her clonidine.  Tr. 1381.

On February 25, 2016, Wagner saw Dr. Gross and reported feeling "pretty stable for all that I'm going through."  Tr. 1386.  She was having car trouble, she was house hunting, and she was staying with her father-in-law, who was home from the hospital but was fragile and had fallen multiple times.  Tr. 1386.  Her sleep patterns were off, and she explained that it may be due in part to working the second shift for 25 years; she also was waking up early to drive her daughter to work.  Tr. 1386.  Her mood was stable but a little depressed and her concentration was normal.  Tr. 1386.  Dr. Gross' impression was bipolar depression, mild, and PTSD, fairly well-treated.  Tr. 1386.  Her medication was continued.  Tr. 1386.

On March 24, 2016, Wagner saw Dr. Gross Tr. 2170.  She had bought a house, and she was a little sad but her mood was on the upswing.  Tr. 2176.  She was more energetic, social, and interested in things, and her concentration was fine.  Tr. 2176.  Her medication was continued.  Tr. 2176.

On May 9, 2016, Wagner saw Dr. Gross and reported that she was doing very well until about a week prior when she stopped her Valproic acid due to a mistake at her pharmacy.  Tr. 2154, 2161.  She was feeling more depressed and tearful and reported concentration deficits.  Tr.

2161.  Dr. Gross restarted her Valproic acid.  Tr. 2161.

On June 6, 2016, Wagner saw Dr. Gross stating that she had improved somewhat since restarting the Valproic acid.  Tr. 2153.  Dr. Gross continued her medication, commenting that she may feel better as she gets unpacked and settled into her new home.  Tr. 2153.

On July 7, 2016, Wagner reported to Dr. Gross that her concentration was not very good and she was still feeling anxious and overwhelmed from moving; otherwise, her mood was good. Tr. 2306.  Dr. Gross remarked that she seemed to be managing in terms of her mental illness and continued her medications.  Tr. 2306.

On August 18, 2016, Wagner saw Dr. Gross and stated that she had been angry and sad and crying a lot.  Tr. 2310.  She had been depressed because her brother had taken very ill, she was concerned about him due to a history of other family illnesses and deaths, and her mother-in-law was also very ill and had been hospitalized.  Tr. 2310.  On September 1, Wagner was even more sad than she was in her last session, reporting that her mother-in-law was dying, her family was struggling, her son was coming home from prison, and her father-in-law was threatening to kill himself when his wife died.  Tr. 2316-17.  She was trying to support everyone and deal with her own feelings of grief.  Tr. 2316.  Dr. Gross commented that Wagner "is understandably quite stressed by a horrendous situation that she's in right now" and decided, after discussion, to add Lorazepam to help her get through the current period of time.  Tr. 2316.

On September 29, 2016, Wagner saw Dr. Gross reporting that her mother-in-law had died about 3 weeks prior.  Tr. 2321.  She had not been sleeping for more than 4 hours, which was not unusual for her as she is a "night owl."  Tr. 2321.  Dr. Gross assessed her as mildly depressed but grieving a death and continued her medications.  Tr. 2321.  On October 27, she reported that her friend of 30 years had committed suicide six days prior, which upset her but

strengthened her resolve that she would not commit suicide.  Tr. 2323, 2327.  Her sleep, energy level, and concentration were all worse.  Tr. 2327-2328.  Upon exam, she had good eye contact, normal speech, reported a sad and irritable mood, her affect was sad and mildly angry, she had normal thoughts, generally good judgment, and pretty good insight.  Tr. 2328.  Her Lorazepam was increased and she was to return in one week to see if she needed further adjustment.  Tr. 2328.

On November 3, 2016, Wagner returned to Dr. Gross, reporting that she was calmer on the higher dose of Lorazepam but that it was making her a little bit sedated.  Tr. 2333.  She was no longer shaking.  Tr. 2333.  She was quite sad, although she was starting to feel a little bit more at peace with the recent deaths of loved ones.  Tr. 2333.  Her sleep was better and her concentration was average.  Tr. 2333.  Her mood was calm and her affect was sad.  Tr. 2333.  Dr. Gross increased her dose of Valproic acid.  Tr. 2333.  At a follow-up on November 21, Wagner reported that she was significantly better on the increased dose of Valproic acid.  Tr. 2339.  Her depression had lifted almost completely and she was handling a number of stressors well.  Tr. 2339.  She was sleeping well and her interest and energy were up, but she continued to have decreased concentration, making it hard for her to complete tasks.  Tr. 2339.  Dr. Gross remarked that Wagner was planning on cooking Thanksgiving dinner for 15 people and was "clearly doing better on the higher dose" of Valproic acid.  Tr. 2339.

On December 19, 2016, Wagner presented Dr. Gross as hypomanic after discontinuing her medications.  Tr. 2344-2345.  Upon exam, her judgement was adversely affected by her illness and her insight was good.  Tr. 2344.  Dr. Gross restarted on Lorazepam and added Seroquel twice a day for the present time.  Tr. 2345.

On January 4, 2017, Wagner saw Dr. Gross and reported that she was very sedated on

Seroquel.  Tr. 2350.  Upon exam, she looked very tired, her mood was ok, and her affect was euthymic.  Tr. 2350.  Dr. Gross adjusted her medications, including having Wagner only take Seroquel at night.  Tr. 2351.

On February 21, 2017, Wagner saw Dr. Gross; she stated that she had stopped taking her Valproic acid because her neurologist wondered whether it was cause of her tremors.  Tr. 2527.  However, her tremors had not gone away.  Tr. 2527.  She was crying a lot and felt depressed, which she believed was caused by being off her Valproic acid.  When taking her medication she did well: her mood had been good, she slept well, had good interest, and her energy and concentration were fine.  Tr. 2527-28.  Dr. Gross put her back on her medication, gradually increasing them until she reached the prior doses.  Tr. 2528.

On March 21, 2017, Wagner returned to Dr. Gross, stating that she was bored and grumpy.  Tr. 2521.  She was using a walker to ambulate.  Tr. 2521.  She felt like she should be better and not have to use a walker, "even though she had knee surgery only a week ago."  Tr. 2521.  She was no longer depressed, she was sleeping well, and her energy and concentration were at baseline.  Tr. 2521.  Dr. Gross advised that she needed more than just monthly sessions with her therapist to work on problems and Wagner stated that she did not want to go more frequently as it was not convenient for her since she moved to the new house.  Tr. 2522.  She agreed to think about seeing someone closer to her house.  Tr. 2522.

On May 17, 2017, Wagner had a two-month follow-up appointment for her right knee after arthroscopic surgery; she was "delighted" with the outcome and was pain-free.  Tr. 2624.

On May 18, 2017, Wagner saw Dr. Gross.  Tr. 2909.  She had had a recent hospitalization for pancreatitis.  Dr. Gross stated that her bipolar and PTSD remained in fairly good control and continued her medications.  Tr. 2914.

On July 18, 2017, Wagner saw Dr. Wilhelm, M.D., at Dr. Gross's office because Dr. Gross was unavailable.  2900.  She admitted that she had not been compliant with her medications, both mental and physical.  Tr. 2901.  She had been crying, was stressed out, had anxiety and irritability, and nothing made her happy.  Tr. 2901.  Her partner had had recent surgery and his father had fallen and broken a rib; Wagner was supervising his care and wanted to change nursing homes.  Tr. 2901.  Dr. Wilhelm's assessment was that she appeared to be going into a depressive cycle "though clearly she has multiple serious stressors," she was noncompliant with medication, and "[t]here also seem to be some personality issues involved." Tr. 2901.  Her medication was adjusted.  Tr. 2902.

At a follow-up with Dr. Wilhelm on June 27, Wagner was anxious about her worsening physical health problems and losing her therapist, and reported that someone she knew had died of an overdose the week before.  Tr. 2902, 2907-8.  She reported being sad, scared, anxious, not sleeping well, and crying a couple of times a day.  Tr. 2907.  Dr. Wilhelm again assessed that she appeared to be going into a depressive cycle and clearly had multiple serious stressors, and adjusted her medications.  Tr. 2907.

### C. Opinion Evidence

#### 1. Treating Source Opinions

<u>Mental:</u> An unnamed physician from the Cleveland Clinic Family Practice completed a questionnaire on behalf of Wagner dated April 20, 2015.  Tr. 310-311.  Diagnoses included major depression, migraines, fibromyalgia, and diabetes.  Tr. 310.  The questionnaire asked for findings on clinical exams and the answer referenced a hospital admission in July 2014 for a new onset of diabetes and worse depression and a hospital admission in February 2015 for suicide ideation, stating that Wagner had been started on Wellbutrin and had improved.  Tr. 310.  When

asked to describe Wagner's limitations, the author opined that Wagner had trouble with daily tasks that required attention; her depression worsened her chronic pain, and, as a result, her ability to perform activities of daily living can be effected; and her conditions affect her concentration.  Tr. 311.

On June 8, 2016, licensed social worker Ms. Janis, Wagner's therapist, completed a form titled Assessment of Ability to do Work-Related Activities (Mental) that was also signed by Janis' supervisor, Ms. Verde.  When asked to evaluate 14 areas of functioning in a work setting, Janis opined that Wagner had a marked degree of impairment in her ability to understand, remember, and carry out instructions; respond appropriately to co-workers; respond to customary work pressures; respond appropriately to changes in the work setting; perform complex, repetitive or varied tasks; behave in an emotionally stable manner; and to perform activities of daily living.  Tr. 2208-2209.  She had a moderate limitation in her ability to relate to other people; maintain concentration and attention for extended periods; sustain a routine without special supervision; perform activities within a schedule, maintain regular attendance, and be punctual; respond appropriately to supervision; use good judgement; and to perform simple tasks.  Tr. 2208-2209.  Her diagnoses were bipolar affective disorder and PTSD.  Tr. 2209.  Janis checked a box indicating that Wagner's condition was likely to deteriorate if she was placed under stress, even that of simple, routine work, and she would likely be absent from work more than four times a month.  Tr. 2209.

**Physical:** Certified Physician's Assistant Mr. Fox completed a Headache Residual Functional Capacity assessment on July 13, 2016.  Tr. 2214-16.  Fox indicated that he had seen Wagner for ten visits and treated her for chronic migraines.  Tr. 2214.  He checked boxes indicating that a number of things triggered plaintiff's headaches and that she experienced

roughly ten headaches per month, each lasting between 12 and 18 hours.  Tr. 2214.  Fox declined

to answer many of the questions on the form, indicating that the answer was "unknown" or that

he was "unable to evaluate."  Tr. 2215.

On September 22, 2016, Wagner saw physical therapist Ms. Kleppel, PT, for a functional

capacity evaluation.  Tr. 2219.  Kleppel opined that Wagner put forth full effort and that,

based on the results, Wagner could perform work in the light physical demand category with

occasional lifting below waist height of 15 pounds.  She noted that Wagner lifted 15 pounds to

shoulder height and 11 pounds overhead, carried 20 pounds, pulled 32 pounds, pushed 25

horizontally, and demonstrated an occasional tolerance for static balance, fine coordination,

pinching, squatting, stair climbing, and walking.  Tr. 2219, 2222.  She demonstrated the ability to

frequently reach above her shoulder, reach forward, bend, and grasp.  Tr. 2219, 2222.  She could

work full time and sit up to 6 hours and 44 minutes (1 hour and 8 minutes at one time) and stand

for up to 2 hours and 52 minutes (50 minutes at a time).  Tr. 2219, 2220.  Kleppel stated that

Wagner's frequent migraines might render her a less reliable employee, needing to call off work

frequently.  Tr. 2219.  In her final sitting and standing comments, Kleppel stated that sitting and

standing abilities were based on observations and Wagner's answers to questions and then

opined that Wagner could sit for up to 4 hours and 30 minutes total in a workday (30 minutes at

one time) and stand up to 2 hours total in a workday (15 minutes at one time).  Tr. 2232.

Dr. Clayton completed two separate questionnaires on August 9, 2017.  Tr. 2881-82.  In

the first, "Physical Abilities and Limitations," she opined that Wagner can work 2 hours per day

Tr. 2881.  However, she also opined that Wagner could sit for 4 hours and stand for 2 hours in a

workday.  Tr. 2881.  She could stand for 15 minutes at one time and sit for 1 hour at a time.  Tr.

2881.  She could never stoop, but could occasionally bend, balance, and perform fine and gross

14

manipulation as well as reach.  Tr. 2881.  She could never work around dangerous equipment or tolerate dusts, smoke, or fumes; would occasionally need to elevate her legs above her waist; and she suffered from moderate pain.  Tr. 2881.  She would be absent more than three days per month.  Tr. 2881.

In the second questionnaire on Off-Task/Absenteeism, Dr. Clayton indicated that Wagner would be off-task for at least 20% of the workday due to major depressive disorder.  Tr. 2882. She would have an inability to concentrate on a sustained basis when she had migraines and was in a depressed state.  Tr. 2882.  She would be drowsy or need to lie down and rest due to chronic fatigue and difficulty staying awake during a bipolar/depressive flare.  Tr. 2882.  Dr. Clayton indicated that Wagner would be absent about three times per month.  Tr. 2882.

### 2. State Agency Reviewers

**<u>Mental:</u>** On December 29, 2015, state agency reviewing psychologist Dr. Tishler, Ph.D., reviewed Wagner's record and opined that Wagner could understand, remember, and carry out simple-to-complex tasks in work settings without strict production quotas, and that she could have occasional contact with coworkers and supervisors in a nonpublic work setting.  Tr. 102. State agency reviewing psychologist Dr. Hoyle, Psy.D., adopted Dr. Tishler's opinion on April 13, 2016.  Tr. 120.

**<u>Physical:</u>** On December 28, 2015, state agency reviewing physician Dr. Bolz, M.D., reviewed Wagner's record and opined that Wagner could perform medium work subject to a limited left-side field of vision restriction.  Tr. 99-100.  State agency reviewing physician Dr. Mutchler, M.D., adopted Dr. Bolz's opinion on April 17, 2016, with the following additional limitations: can never climb ladders, ropes, or scaffolds; must avoid all exposure to workplace hazards such as moving machinery and unprotected heights; and must avoid concentrated

exposure to noise, vibrations, fumes, odors, dusts, gasses, and poor ventilation.  Tr. 116-18.

### D.  Testimonial Evidence

#### 1.  Wagner's Testimony

Wagner was represented by counsel and testified at the hearing.  She described her past work as a manager at a service station, including duties such as supervising staff, stocking and inventory, payroll, and EPA compliance.  Tr. 49.  She was laid off in 2008 and, thereafter, attended school and got a two-year degree in medical coding.  Tr. 73-74.  She lives with her boyfriend of 17 years and her adult daughter.  Tr. 51, 64.  She has a driver's license and drives once or twice a week to doctor appointments.  Tr. 48.  She can't drive long distances because she will fall asleep.  Tr. 48.  She does laundry; her daughter places the clean laundry on the kitchen table and Wagner sits and folds it.  Tr. 78.  She does not garden, cook, or grocery shop.  Tr. 78. She can sweep, mop and vacuum, although she has to take breaks.  Tr. 78.

When asked about her condition in April 2013, Wagner stated that she was having migraine headaches about four or five times a week.  Tr. 52.  To treat her headaches at that time she would put a blindfold on, earplugs, use a cold pack, and take Aleve.  Tr. 53-54.  She was seeing her family physician, Dr. Clayton, for her headaches and she was on medication for them, but the medication did not help.  Tr. 53.  Her headaches lasted all day, sometimes she would vomit, and the next day she would have a "migraine hangover" because she felt so poorly.  Tr. 54.  She started seeing a specialist, Dr. Fox, in 2015, and her headaches improved.  Tr. 53, 55. She went to the Cleveland Clinic and had infusions five days in a row.  Tr. 55.  Now she returns for shots every three months.  Tr. 56.  She gets 32 shots in the occipital area: her temples, neck, shoulders and back.  Tr. 56-57.  This treatment has helped her headaches, although she will still get breakthrough headaches once or twice a week depending on the week, the weather, what she

ate, etc.  Tr. 57.  When she has a headache, she spends a lot of time sleeping and she cannot do anything else.  Tr. 58.

She also suffers from bipolar, major depression, and PTSD.  Tr. 59.  She was first treated by Dr. Clayton, who put her on medication.  Tr. 59.  Now she also sees a psychiatrist, Dr. Gross, who has her on medication as well.  Tr. 60.  She sees a therapist, Ms. Janis.  Tr. 60.  She has had mental problems for many years, but in 2014 she tried to commit suicide.  Tr. 60-61.  She was driving with her gun to kill herself when she was pulled over by the police.  Tr. 61.  She was taken to the hospital and admitted.  Tr. 61-62.  She was discharged after a week on the condition that she see a psychiatrist and undergo therapy, and that is when she started seeing Dr. Gross and Janis.  Tr. 62.  Since then, she has been compliant with her medication and diligent with her treatment appointments.  Tr. 62.

Wagner stated that, due to her mental impairments, she is often distracted so she doesn't hear what people are saying to her.  Tr. 62.  She could no longer perform her past work at the service station.  Tr. 62.  During the hearing she was shaking, which she explained is caused by her anxiety.  Tr. 63.  She is also very angry on a regular basis and a single word from someone can set her off screaming and yelling.  Tr. 63-64.  She has problems focusing: when she plays a game on her computer, or having to re-read instructions four or five times.  Tr. 66.  When asked whether her problems concentrating could be a side effect of her medications, Wagner stated that she did not know.  Tr. 66.  She is on 22 different medications.  Tr. 66.

Wagner testified that she doesn't go out of the house by herself because she doesn't like to.  Tr. 68.  She is scared something is going to happen.  Tr. 68.  When she goes to a restaurant, she often sits against the wall so no one can be behind her.  Tr. 68.  She has fibromyalgia and has pain in her joints and wakes up stiff.  Tr. 68.  She sees Dr. Clayton for this impairment as well.

Tr. 69-70.  She also has neuropathy in her feet and gets muscle cramps in her toes and feet.  Tr. 69.  She had arthroscopic surgery on her right knee and it is better; however, it still swells a lot and she has to have the same surgery done on her left knee.  Tr. 71.  She ices and elevates her legs about once a day, if she has been walking around outside in her backyard.  Tr. 72.  She also has vision problems in her left eye.  Tr. 75.

The ALJ confirmed with Wagner that she had been having migraine headaches when she was working at the service station and Wagner agreed that she had.  Tr. 74.  She has had migraine headaches since 1993.  Tr. 75.  She stated that she used to take off work a lot.  Tr. 74.  She would have about three headaches a week, although some were not bad and she could work through them.  Tr. 75.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 78-79.  The ALJ discussed with the VE Wagner's past relevant work.  Tr. 79.  The ALJ asked the VE to determine whether a hypothetical individual of Wagner's vocational profile could perform Wagner's past work or any other work if that person had the limitations that were subsequently assessed in the ALJ's RFC determination.  Tr. 82-83.  The VE answered that such an individual could not perform Wagner's past work but could perform the following jobs with significant numbers in the national economy: stock checker, cleaner housekeeper, and price marker.  Tr. 83.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

_____

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his October 10, 2018, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.  Tr. 18.

2.      The claimant has not engaged in substantial gainful activity since June 1, 2009, the alleged onset date.  Tr. 18.

3.      The claimant has the following severe impairments: insulin-dependent diabetes mellitus; status post right knee arthroscopy; migraine headaches; left low vision secondary to Duane syndrome and strabismic amblyopia; obesity; mood disorder; and posttraumatic stress disorder.  Tr. 18.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 18.

5.      The claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), except she can never climb ladders, ropes or scaffolds; she is limited to frequent left eye visual acuity and field of vision; she should avoid concentrated exposure to noise and vibration; she should avoid concentrated exposure to fumes, odors, dusts, gases and poorly ventilated areas; and she should avoid all exposure to hazards, such as dangerous machinery and unprotected heights.  Claimant is further limited to routine tasks with no strict time demands and no strict production quotas; and she is limited to no direct work-related interaction with the public, and occasional interaction with supervisors and coworkers.  Tr. 20.

6.      The claimant is unable to perform any past relevant work.  Tr. 24.

7.      The claimant was born in 1968 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 25.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 25.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 25.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.  Tr. 25.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2009, through the date of this decision.  Tr. 26.

**V. Plaintiff's Arguments**

Wagner argues that the ALJ erred because he did not explain how he took into account the limitations assessed by Wagner's therapist, licensed social worker Ms. Janis, despite the fact that the ALJ stated that he took those assessed limitations into account when formulating the RFC.  Doc. 14, pp. 18-20; Doc. 17, p. 2.  Wagner also challenges the ALJ's decision with respect to his treatment of the opinion of the physical therapist who evaluated Wagner, Ms. Kleppel. Doc. 14, p. 17; Doc. 17, p. 2.

**VI. Law & Analysis**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

**A. The ALJ erred because he did not explain how he took into account the limitations assessed in Janis' opinion, despite asserting that he had taken those limitations into account.**

Wagner argues that the ALJ erred because he did not explain how he took into account the limitations assessed by Wagner's therapist, licensed social worker Ms. Janis, despite the fact that the ALJ stated that he took those assessed limitations into account when formulating the RFC.  Doc. 14, pp. 18-20; Doc. 17, p. 2.  The undersigned agrees.

Janis, a licensed social worker, is a non-medical source.  *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838, n.9 (6th Cir. 2016) ("According to Social Security Ruling 06–03p, [] a licensed clinical social worker is not an acceptable medical source") (internal quotation marks omitted).  However, the ALJ still must explain the weight given to "other sources" such as licensed social workers.  *See* SSR 06-03P, 2006 WL 2329939, at *6 ("…the adjudicator generally should explain the weight given to opinions from … "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.").

The ALJ considered Janis' opinion as follows:

Treating therapist, Patricia Janis, LISW, completed a medical assessment of claimant's mental ability to do work related activities on June 8, 2016. Patti Verde, LISW-S, also signed this opinion on June 10, 2016. The therapist completed a checklist form regarding claimant's mental abilities in 14 categories of mental functioning. The indicated degrees of limitation in the categories were "none", "mild", "moderate", "marked" and "extreme". Ms. Janis indicated the claimant has moderate limitations in seven categories and marked limitations in the remaining seven categories (Exhibit 25F/2-3). She also indicated the severity of limitations had existed since June 1, 2009. The claimant's diagnoses included bipolar affective disorder and PTSD, and she was likely to deteriorate under stress. Ms. Janis also opined claimant would be absent from work four times a month (Exhibit 25F/3). The undersigned gives this opinion limited weight because the balance of the mental health evidence does not support the work absence limitation. The

mental residual functional capacity above takes into account therapist Janis' marked limitations for the claimant (Exhibit 25F/3).

Tr. 23-24.

Wagner argues that it is not clear how the ALJ accounted for the marked limitations assessed by Janis in the RFC.  Additionally, she points out that, based on the definition of "marked" in the opinion form Janis filled out, Janis opined that Wagner would be off task 16-20% of the day when performing the following tasks: understanding, remembering, and carrying out instructions; responding appropriately to co-workers, customary work pressures, and changes in the work setting; performing complex, repetitive or varied tasks; behaving in an emotionally stable manner; and performing activities of daily living.  Doc. 14, p. 19 (citing Tr. 2208-2209).  And because the VE testified that there would be no work available for an individual who would be off-task more than 9% of a workday, Wagner contends, the ALJ's oversight was not harmless.  Doc. 14, p. 19.

Defendant disagrees and offers three reasons why the ALJ's consideration of Janis' opinion is proper.  First, Defendant asserts, "the ALJ noted that LSW Janis's opinion was inconsistent with other evidence (Tr. 23)," and goes on to detail how Janis' opinion is inconsistent with other record evidence.  Doc. 16, p. 9.  But the ALJ did not state that Janis' opinion regarding marked limitations was inconsistent with other evidence.  Nor did the ALJ describe record evidence that he believed undermined that aspect of Janis' opinion.  Although the ALJ detailed a fair sampling of record evidence elsewhere in his decision, he did not draw any conclusions from that evidence such that a reviewer can follow his reasoning as to how that evidence relates to the limitations in Janis' opinion.  *See* SSR 06-03P, 2006 WL 2329939, at *6.

Next, Defendant contends that the ALJ "pointed out that he accommodated most of the findings assessed by LSW Janis, including marked findings."  Doc. 16, p. 9.  For instance,

Defendant argues, Janis found Wagner to have marked limitations "in complex or varied tasks" and the ALJ limited her to routine tasks; similarly, Janis assessed marked limitations in interacting with coworkers and the ALJ limited her to occasional interaction with coworkers and no contact with the public.  Doc. 16, p. 9.  Those limitations, Defendant posits, are consistent. The undersigned disagrees.  While the interaction-with-coworker limitation in the ALJ's RFC is arguably consistent with Janis' assessed limitation, the remainder of the limitations are not.  For instance, Defendant omits that Janis found Wagner to have marked limitations in "complex, *repetitive*, or varied" tasks (Tr. 2209); the ALJ's RFC limiting Wagner to performing "routine" tasks does not rule out "repetitive" tasks, which Janis found Wagner cannot do without being off task 16-20% of the time.

Janis' opinion found that Wagner has marked limitations, defined as "affect[ing] the job activity between 16%-20%," in the following areas:

> her ability to understand, remember, and carry out instructions; respond appropriately to co-workers; respond to customary work pressures; respond appropriately to changes in the work setting; perform complex, <u>repetitive</u> or varied tasks; behave in an emotionally stable manner; and to perform activities of daily living.

Tr. 2208-2209 (emphasis supplied).

The ALJ's RFC did not rule out repetitive tasks.  It limited Wagner to:

> ….routine tasks with no strict time demands and no strict production quotas; and she is limited to no direct work-related interaction with the public, and occasional interaction with supervisors and coworkers.

Tr. 20.

It cannot be said that the ALJ's RFC limitations are consistent with the marked limitations assessed in Janis' opinion.  To be sure, an ALJ is not required to adopt verbatim the limitations assessed in an opinion.  *See Reeves v. Comm'r of Soc. Sec*., 618 F. App'x 267, 275 (6th Cir. 2015).  But here, the ALJ stated that his RFC took into account Janis' assessed marked

limitations; the RFC does not, on its face, reflect Janis' assessed marked limitations; and the ALJ did not offer any explanation for how he purportedly took into account Janis' assessed marked limitations.  And the balance of the ALJ's decision does not answer that question.  Simply put, the ALJ failed to explain what he meant, and his decision is in error.  *See* SSR 06-03P, 2006 WL 2329939, at *6 (The ALJ should "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."); *Scappino v. Comm'r of Soc. Sec.*, 2014 WL 1097906, at *15 (N.D.Oh. March 19, 2014) (reversing the ALJ's decision because the ALJ failed to explain the weight he gave to non-medical source opinions).

Defendant's final reason advanced in support of the ALJ's decision also fails.  Defendant asserts that the ALJ chose to rely on the state agency reviewers' opinions when formulating his RFC.  Doc. 16, p. 9.  This argument misses the point: regardless of how the ALJ weighed the state agency reviewers' opinions, the fact remains that the ALJ expressly stated that he took into account Janis' marked limitations in his RFC, but the RFC does not contain Janis' marked limitations or an explanation for the discrepancy.  Moreover, the ALJ's discussion of the state agency reviewers' opinions is as paltry as his discussion regarding Janis' opinion.  There are no clues in his discussion of the other opinions in the record that shed light on his treatment of Janis' opinion.  Because the ALJ's error may have an effect on the outcome of the case, remand is required.  SSR 06-03P; *Scappino*, 2014 WL 1097906, at *15.

**B. On remand, the ALJ will have an opportunity to reassess Kleppel's opinion**

Wagner argues that the ALJ also erred because, when assigning "considerable" weight to the opinion of physical therapist Kleppel, the ALJ did not take into account or discuss Kleppel's opinion that Wagner could only occasionally balance, squat, climb stairs, and perform fine

coordination and pinching.  Doc. 14, p. 21.  Defendant submits that Wagner cannot show reversible error because (1) according to the description in the Dictionary of Occupational Titles ("DOT") of one of the jobs the ALJ found Wagner could perform—housekeeper—Wagner could still perform the housekeeper job even if she were as limited as Kleppel opined; and (2) "the ALJ cited enough evidence that a reasonable adjudicator could agree that restrictions to occasional balancing, climbing stairs, and fine manipulation were not warranted."  Doc. 16, p. 14.  However, both arguments Defendant asserts, interpreting job descriptions in the DOT and weighing evidence, are matters for the ALJ, not the Court.  *Garner*, 745 F.2d at 387 (The court does not try the case *de novo*, resolve conflicts in evidence, or assess credibility).  On remand, the ALJ will have an opportunity to reassess Kleppel's opinion.

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED** for further proceedings consistent with this opinion.[4]

Dated: September 21, 2020

*/s/Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[4] This opinion should not be construed as a recommendation that, on remand, Wagner be found disabled.